Good morning Judge Reinhart, Judge Graber, Judge Shader. My name is Stephen Yaglin. I represent the plaintiff in this case. By my count, it's been 577 days. Could you speak up a little? I'm sorry, I'm not allowed to say I'm loud. No, I have to ask you to speak up, Mr. Yaglin. I know. In my count, it's been 577 days since the confinement, if one can call it that, at Guantanamo Bay began. On January 10, 2002. This is a terrible time for the United States of America. First, because it's very dangerous for those of us who live here in an unpredictable way. But in a second way that is as important, it's a terrible time for the United States of America. Because we are in a situation in which we can, and I think now are treating people in a way that makes us other than whom we are or whom we say we wish to be. Also, I have a very, very, very preliminary question about jurisdiction in this case. Your petition alleges, or your client's petition alleges, that his brother has been detained. It seems to do so on information and belief, and one of the requested remedies is to let him know whether his brother is in fact detained. And in the supplemental brief, the government now says they don't have any idea whether he's being detained or not. Where is the body that allows the court to exercise habeas jurisdiction if we don't know whether he's actually being detained, as distinct from dead or in hiding or somewhere else? There are two answers to that. One is in the insolence of the government who has failed to obey and who has disobeyed the order of this court. This court issued an order about three weeks ago. I'll take that up with them when it's their turn. But assume for the moment that we don't actually know whether or not this person is being held. How can we possibly exercise habeas jurisdiction? It's been alleged, and I think that this court is required to take the facts of the petition as they've been pled as true. It's also been conceded by the government. More than that, I don't know how to answer that question. Well, in what way conceded when they say they don't know? Well, they say that for the purposes of this court having issued that order that they conceded. That's because they want a ruling on the merits. Everybody seems to want a ruling on the merits. You know, these are difficult times when the United States government can do what they're doing here and take someone, as we've alleged, and hold that person. And then when the court, when a federal court says to the government, tell us if you have him or not, and they duck the question with an insolent answer, well, yeah, you can assume that. I think the court has a duty to do something about that. I mean, the government can't take someone and hide them and say. Let me ask you, Mr. Yager, your petition from February 24th, 2003, says that he continues to be held against his will illegally. That's what's before us. What is it that has changed? Is it that you have no information as to whether they have released him? But you did allege, as I understand it. Yes, I did. And what I said in the supplemental brief at page three in response to your question, Judge Reinhart, is Petitioner's counsel has no information as to Grady's present custodial status. Okay, but you did allege, not on information and beliefs, but you just alleged that he was held as of a certain point. He was picked up, held, and then you don't know what they've done to him since. Is that right? That is correct, Your Honor. Okay. Well, I don't know how you're supposed to know what happens to people who are picked up and detained and how you're supposed to know what happens to them afterwards. I would assume that only the government could tell you that. You know, it reminds me of a 1937 book by Andre Malraux called Days of Wrath. You've only got 20 minutes. And I won't use all of them. There is a 1937 book by Andre Malraux called Days of Wrath, in which a fellow named Krasner, who's a communist, is picked up by the Nazis, and he's held incommunicado, and all he does is he keeps banging on the wall of his cell, not knowing what to do, but nobody knows he's being held. This is Kafkaesque. This is like something out of The Castle or The Trial. It also reminds me, and I hadn't prepared this, of an essay by Kafka called The Gates of the Law, the moral of which at the end of the parable is that this gate is only there for you, for a fellow who sits there for eternity trying to get in and seeing everybody else get in. This is the reverse of The Gates of the Law. They won't let him out, and they won't tell you if he's there. This is crazy. This is just nuts, and I don't say that in a colloquial way. Let's assume for the moment that we'll have to deal with Judge Graber's preliminary question of whether we know enough to know that he's there to act. Assuming we get over that question, and Judge Graber has more to ask the government on that, let's get to the question of our authority or the federal court's authority in general. That starts out in 1803 with Marbury v. Madison, from which I'll quote, if he has a right and that right has been violated, do the laws of his country afford him a remedy? The question is his. Is this his country? Can the laws operate with respect to his situation? If this court adopts the scam that is being perpetrated by the United States. . . Do you agree that if he were held in Pakistan or Afghanistan or in Saudi Arabia or Iraq, that we would have no jurisdiction? Makes it a much more difficult question, but he's not held in any of those places. He's held in a place where only the United States exercises jurisdiction, notwithstanding that bogus treaty for fueling, for a coal fueling station, that was forced down the throat of Cuba after the Spanish-American War in 1903. Cuba doesn't have sovereignty at Guantanamo Bay. That's ridiculous. It's just absolutely ridiculous. The question is, will this court deal with reality, or will it base an issue as important on this on a legal fiction? That treaty is a legal fiction. As I indicated . . . Well, it's a treaty. It uses the word ultimate sovereignty when it refers to what Cuba retains. I think the Ralpho case that is cited in the Rasul case supports our position. The analogy fits. The United Nations had sovereignty over Micronesia, and yet American law was applied there. The situation is exactly the same here. The Rasul court, the district court opinion, made a mistake and didn't understand the Ralpho case because it was trying to twist things to reach a preordained result. Well, I don't really think that's a fair description of the district court. It seemed to me the district court was not trying to avoid reaching a result. It almost asked us to see if we could reach a result. No, I mean the district court . . . I mean the court in the Ralpho . . . in the Rasul case. No, no, no. Judge Matz finally came around after the passage of time and opined that he hoped that there was some principled way in which this court could reach a result that would undo or mitigate or ameliorate the awful situation that was going on. Judge Matz wasn't as happy to do that a year ago when the people . . . What is it that you would like the court to do or to . . . What kinds of things would you ask the court to do in habeas? Everything except . . . and I'll enumerate those things in a second, but it's easier to do it by exclusion first. Everything except ordering that the person be released because there isn't any basis now without any information to ask for his release. I would if I could, but I think principle prevents me from doing that, that he be identified as being there, that he be given access to counsel, and that he be given access to the courts of the United States of America so that he can pursue a habeas corpus proceeding to challenge the legality, the constitutionality of his detention. And I thought you were also asking what the basis . . . for them to identify the basis of his detention. I had thought that would be subsumed in giving him an ability to seek habeas corpus, but yes, of course, one of the things that we asked for was the basis for his detention. And I think he has a right to that because the United States has him. And putting him in Guantanamo may be thought to be brilliant by some people in the Justice Department, but it's a scam. It's the kind of scam that the Justice Department would prosecute if somebody pulled those kinds of shenanigans with them. It's just outrageous. I want to continue just to read one more sentence from Marbury v. Madison. The very essence of civil liberty certainly consists of the right of every individual to claim the protection of the laws whenever he receives an injury. One of the first duties of government, and I think it is the first duty of government, is to afford that protection. That's the protection that is asked for here. Continuing with the last sentence from this, and I say I have plenty of time so I can read this, the government of the United States has been emphatically termed a government of laws and not of men. It will certainly cease to deserve this high appellation if the laws furnish no remedy for the violation of a vested legal right. Does this person have a vested legal right? He's got a legal right because he's a human being, because our government is holding him. We know there's a Supreme Court case that says that in similar circumstances, if the person has not had any connection with the United States, that all of those wonderful phrases you read that are supposed to determine how this country functions, that they're not applicable to somebody who has not been in the United States or one of our territories or positions, where all the activities and disconfinement have occurred outside, extraterritorially. Johnson v. Eichentrager is distinguishable from this case. But isn't the question not whether we should apply all these wonderful principles, but whether they apply to Guantanamo? Yes, they do, because Johnson v. Eichentrager is not controlling in the unique circumstances of this case, and especially when, as here, our government has set up this situation to try to put it within the umbrella of Johnson v. Eichentrager. The people in that case were given access to legal process. They had a trial, which I believe was in Shanghai in China, if I'm not mistaken. They were given legal process. They were then transported to Germany and held in detention by Americans. The people in Guantanamo Bay haven't had access to anything. I just don't see how that case applies, and I don't see how it applies in light of the status of Guantanamo under the 1903 fueling treaty. Well, those are two different questions. One question, and I think probably the more significant question, is what the status of Guantanamo is for the application of habeas. It's the same, I believe, or sufficiently similar to come within the ambit of what the status of Micronesia was in the Ralfo case. It is a place being administered by the United States with respect to which another entity, in the Ralfo case the United Nations, had sovereignty. If our laws and our constitution... Except the United Nations is not itself a sovereign nation. Cuba is a sovereign nation. I think that's the issue. And it maintains under the treaty and under the lease ownership and sovereignty over the territory that it has leased to us. Why isn't that analogous to what occurred in Johnson? Because I think that sovereignty in that sense is nonexistent. It's like a unicorn.  If the United States, in its exclusive discretion, says, okay, we're going to leave here now, maybe that will happen after Castro leaves. Who knows? But Cuba doesn't really have sovereignty. I don't think sovereignty is necessarily something that's there because it's written on a piece of paper. I think one has to look at the facts in the real world. Can one really say that Guantanamo Bay is under the sovereign jurisdiction of Cuba? As I indicate in the brief, if Fidel Castro had said let them out of there, everybody knows what would happen. It would probably end up on the Jay Leno show with everybody laughing about it. Cuba is no more... Well, that's kind of true of every lease. If you have leased a house, the owner can't come in and just tell you to have your guests, who are otherwise behaving, leave. There are certain indicia of quiet enjoyment to any lease. So I don't understand how the United Nations is the equivalent of Cuba in your discussion. I don't say that the United Nations is the equivalent of Cuba. What I say is that the configuration is the same in that, putting aside who was sovereign in Micronesia, the United States exercised complete control over Micronesia, and therefore American law applied. Didn't the United States exercise complete control over the prison in Germany in Johnson v. Eisentrager? I'm sorry, I didn't hear the first word of your question. I say did not the United States have exclusive control over the prison where the people were held in Germany in Johnson v. Eisentrager? Yes, it did. How do we distinguish that then from, and a couple of times at least, although not exclusively in Johnson, the court did use the term sovereign as contrasted with control. So how do we distinguish our situation from that one? First of all, the prison was in a place where there was a sovereign country, as far as I understand. Well, there was a sovereign country in Gitmo, as they used to call it, Guantanamo Bay. And the people in the Eisentrager case and the Johnson case had had access to legal process. They weren't being held incommunicado. And I think that those facts that are present in this case, that is the absence of access to counsel or to judicial review, weren't present there and make it distinguishable in that way. Did they have access to United States legal process in Johnson? No. Well, is it somehow a question of delegation? Is that the idea? How is that a distinction? I can't answer that question. I'm just not smart enough to answer that question. I apologize. That's a significant issue. And I don't know what the resolution of it is. I would like to reserve the three minutes and five seconds I have remaining. Thank you, counsel. Good morning, Your Honors. And may it please the Court, Paul Clement for appellees' respondents. I'd like to start by answering Judge Graber's question. Yes, I'd appreciate that. Because it strikes me as astonishing that the government says after a year and then some that they have no idea whether this gentleman's brother is or is not being held at Guantanamo Bay. Well, with respect, Your Honor, we certainly didn't mean to be heard as saying that we have no idea. But there's a difficulty with respect to the question. Do you have an idea but you're not telling us, or do you not know whether he's there? No. The problem is there would be two situations with respect to somebody at Guantanamo. There would be when there's an allegation that the individual is down there. There would be ruling out the possibility that he's there. And then there would be the prospect of definitively ruling in that, yes, that's an individual that we have. Now, with respect to the records. Don't you keep records? What's that? Don't you keep records? We do keep records. And we are interested in nothing else more than the true identity of the individuals that are down in Guantanamo. The difficulty is there's some subset of the individuals down there that haven't cooperated with the United States, haven't fully provided their information as to their names or have provided multiple aliases. And so if I can just contrast this with the case involving ---- Let me just say that the information here is incredibly incomplete. I'll just put it that way. So it seems to me that a complete answer to the court's questions would have been either there is or there is not a person by the name of Salim Garabi who is held at Guantanamo Bay. And if the person ---- and then you can go on to explain whether that's definitive because it's a common name like John Doe or because they're aliases or whatever. But this unable to determine sounds like you have no idea who's there. Well, as I said, we do know who's there. At the time that we filed the supplemental brief, we didn't have anybody whose name was a very close match. Now, we have gone back and we have looked, and there now appears to be somebody. The name is not identical, but it bears ---- it's a much longer name and it's spelled somewhat differently. But it bears many resemblance to it. So the honest answer is right now we think we have him, but we're not sure. We're not ---- we can't confirm it 100 percent. And if I could say, if I could contrast this with the situation that we faced in the D.C. litigation involving the individuals from Kuwait. There we were given a petition that provided much more complete information, and so in that circumstances we were able to definitively confirm, i.e., rule in the fact that we had those individuals down there. Now, we're reasonably close. So you're telling us today that you're reasonably certain you actually do have this individual, although when translated into English letters or whatever, it doesn't look exactly the same. Is that ---- That's exactly right, Your Honor. And, again, there's some information that one might expect to have been in the petition here that's not there, such as the actual country of origin. I mean, the petition, for example, alleges that this individual is from a foreign country but doesn't specify which one. That's the kind of information that, if we could get more specificity on that, excuse me, might enable us to more definitively confirm it. But ---- and this process is ongoing, and we are, as I say, close, and as soon as we can confirm it, we'll inform the court of that forthwith. It just ---- unfortunately, the request put us in an awkward position because there are a few individuals down there who we simply cannot definitively identify. And so under those circumstances, it's a bit difficult for us to say with clarity. As I said, it's certainly very, very difficult for us to rule out the possibility that the individual is there. I think we are close, as we were able to in the other cases, to rule in the possibility that the individual is there. Excuse me, Your Honor. With all respect, I mean, I wouldn't want the court to understand us as being anxious to get to the Eisentrager issue or to the jurisdictional issue. I mean, we would ---- if this individual ---- if there were a way to confirm that this individual wasn't down there, we'd very much like to be able to do that. And as an example, for Your Honor, in the coalition of clergy case before the Ninth Circuit, it was at the government's suggestion that the panel ruled only on the standing issue and did not move on to the other issues. And so I think it would be a mistake to say that the government is in any way anxious to get a decision on the Eisentrager decision. It's just that on the state of the record, certainly as it appeared at the time that the court asked the question to the government, we couldn't rule out the possibility he was there, and so we felt like we were in a position where those issues had to be reached. Now, a few weeks hence, as I say, I think we're very close to being able to confirm the individual is there. We certainly suspect that and in any event are in no position, because we now suspect that, to deny the fundamental allegation that he's there. So I'm sorry for that detour on that preliminary issue. It's a very important issue. And I'm sorry if in any respect the supplemental briefing was perceived as not being responsive. It was a very difficult question to respond to in large measure because there are some individuals down there whose identity is not fully known. And in answer to one of the questions, that is something that the government is obviously quite curious about and does try to very definitively try to identify the individuals down there. Now, if that's sufficiently responsive to the standing question, I guess I would go on to the issue of the Eisentrager decision. And I think that a number of... In this case, with respect to the territory known as Guantanamo, there is no law other than United States law, is that right? If somebody commits an offense in that territory, an American, a Cuban, a Haitian, they're subject to United States law? I think that's right. They might be subject to military law. They might be subject to United States civilian law as to those statutes that apply extraterritorially. Well, there are criminal offenses there. Someone commits a murder in Guantanamo, a worker there. There's more than a military base, I gather. Or there are businesses there. There are houses there. There are houses there. There are no industrial... A man murders his wife, people who work on the base, Cubans or Haitians or whatever. They're prosecuted under American law, or does Cuba prosecute them? I'm not 100% sure what would happen if a Cuban national committed an offense on Guantanamo. If an American committed an offense on Guantanamo and was a criminal offense, they could be prosecuted through military authority, but they also could be prosecuted in the United States courts. But it's very important that they would be prosecuted in the United States courts by virtue of specific provisions that make the United States criminal law apply extraterritorially to United States military bases abroad. And so that's true not just of Guantanamo, but with respect to all of the United States military facilities abroad. And there's obviously a critical distinction for purposes of this case and Eisentrager between extraterritoriality and sovereignty. As I understand it from reading, I think it was some of the facts in one of the cases where they talked about people who were not Americans who were brought to Virginia and tried. My understanding is there is no law in Guantanamo other than American law. And I think that certainly in the context, you may be referring to the United States against Lee case, which is a Fourth Circuit case, which was a criminal prosecution. And if you look at that case, it's very clear that the reason that the Fourth Circuit had jurisdiction there is because of a specific provision, I think it's 18 U.S.C., maybe Section 7-3 or 3-7, I may have it transposed, that makes the United States criminal laws apply extraterritorially on a military facility like Guantanamo. It's your position, I gather, that the United States could hold these people, however many they have there, they could take anyone and hold them indefinitely or execute them or hold them in conditions of confinement that would violate all rules of international law, and there would be no right that any of them would have to any access to anything? No, I don't think that's their position, Your Honor. What right would they have if you were torturing them, if you held them 20 years, if you never did anything and you started executing them, where would they go? Well, if the United States, to take your hypothetical, were to torture these individuals or execute them, that would clearly violate international law. And where would they go? What's the forum? The forum for that would be through political, diplomatic, and military channels, and that's clearly what the Supreme Court Military channels, so does that mean they should invade or? No. I mean, do they have any right, people who are being tortured or executed, have they any rights at all? The Supreme Court specifically addressed this in the Eisentrager decision at footnote 14, and what they said is the fact that the United States courts don't have jurisdiction over aliens held abroad doesn't mean that those individuals have no rights. It simply means that those rights are not judicially enforceable in the United States courts, and they're enforceable through political, diplomatic channels, and so these individuals are in contact with the international. It may be that they would have rights to foreign courts in those circumstances. I'm not an expert on that particular issue. It may be, but the point would be that there are other. Here we know that there would be no judicial remedy for executions, torture, anything with the United States death. No, again, I think that there would be no judicial forum in the United States for those claims, but those claims would be cognizable in international law through those channels and footnote 14 in Eisentrager. I point Your Honor's attention to the dissent in Eisentrager because Justice Black had some of these same concerns that the individuals who were being held in military custody in Germany, in the United States facility in Landsberg, Germany, would not have access to the German courts. We don't know what they would have done in Eisentrager had the situation been different. These are people who had military trials. There was legitimacy to it. We don't know what the decision would have been had the United States said we don't have to try anybody at all. We don't have to do anything. Well, though, I do think the two fund. I mean, I think Judge Kohler could tell a in the Russell case correctly identified that with respect to its jurisdictional holding. The analysis of the Eisentrager decision is effectively two dimensional. It focused on the fact that they were aliens and on the fact that they were being held outside United States sovereign territory. And once those two conditions are satisfied, then jurisdiction under habeas doesn't lie. The court didn't focus. There's really nothing in that opinion that focuses on the degree of procedures that they had already been availed of, that it doesn't describe in any great detail the nature of the proceedings in China or anything like that. You're saying it's a difference but not a rationale of the court's opinion. Is that? It may well be a difference. I mean, certainly I'm not you know, these individuals have not yet been subjected to a military tribunal. So in that sense, there are factual differences. But those factual differences are not married up with the court's reasoning in Eisentrager, nor in subsequent cases interpreting Eisentrager. Could I ask you a kind of lawyer like question, if I may be pardoned? You've talked about sovereignty. The lease of Guantanamo Bay talks about continuance of ultimate sovereignty. What does the word ultimate mean in that context? I think ultimate in that context means definitive or, I mean, I think. Really? Could it not mean temporal? I don't think so, Your Honor. And what I would point to is two things. One. Notice the contrast in the lease. What it says is that while on the one hand the United States recognizes the continuance of ultimate sovereignty, the Republic of Cuba, over the above described areas of land and water, on the other hand the Republic of Cuba consents during the period of occupation by the United States, the United States shall exercise complete jurisdiction and control over those areas and so on. Now, doesn't that contrast suggest a temporal difference rather than the one that you've identified? I don't think so, Your Honor. And I would point to two different things. First of all, just the very phrasing of recognizing the continuance of ultimate sovereignty. I mean, that is an ongoing permanent condition. Now, if all they were talking about was some sort of reversionary. What is the content of Cuba's sovereignty over Guantanamo Bay? What substantive content does it have now? Well, let me answer the question this way by saying that the United States, I mean the very fact that the United States' presence in Cuba is there by lease shows that the United States is not there enjoying the rights of the sovereign. What's the term of the lease? The term of the lease is more or less until the United States pulls out. But think a sovereign, if it wants to, has over an area which it is sovereign, has the right to give that land to anybody else it wants. What other lease, to your knowledge, gives the unlimited time of the term of the lease to the lessee? Your Honor, I'm not, you know, I haven't surveyed all the different leases. I know 99-year leases are quite common in this area. 999-year leases I've drafted in the U.K. But the idea of permanence, you know, there's a fiction, of course, that we indulge in that respect perhaps. But this one has no time limit at all, does it? Well, it does have. But, again, during the time limit there are significant restrictions on what the United States can do there. The parallel lease from July of 1903 limits the United States' ability to perform industrial operations on the island. Now, if the United States enjoyed true sovereignty over the area, then. . . What do you mean the parallel lease? Well, what happened is there are two. . . One from February of 1903, one from July of 1903. Then there's a treaty of 1934 that expressly incorporates both those leases. So both of those leases, I think, are relevant points for the Court's attention. And Article III of the July 1903 lease specifically says that the United States can't operate industrial operations on the island. Now, if the United States were sovereign there, that restriction would have no place. If the United States were sovereign there, it could convey the Guantanamo base to any other country it wanted to. Now, those are all things that the United States can't do. And those demonstrate that even though, pursuant to the lease, the United States does exercise control, it does not operate as a sovereign even during the tenure of the lease. And if I could just make one point that I think is important, is that the Court doesn't write on a blank slate when it addresses the question of what is the status of leased military bases abroad, because the Supreme Court addressed that question in both United States against Spilar and in Vermilla Brown against Connell. And in those cases, they specifically said that leasing of a military base abroad does not affect a transfer of sovereignty. And specifically in the Spilar case, which involved Newfoundland, the Court said that the lease there was the same that the lease – the term before in Vermilla Brown. And in Vermilla Brown, which dealt with the base at Bermuda, the Court specifically said that that lease was in all material respects similar to the lease for Guantanamo Bay. So even with respect to Guantanamo Bay itself, this is not an issue the Supreme Court has not addressed. Did that one have perpetual term? Well, the Guantanamo base did at the time that the Court referred to it in Bermuda. My understanding as I'm standing here, Your Honor, is that the Bermuda base had a 99-year term. I can try to check that for you, but that's my understanding. But again, notwithstanding the difference in the term length, the Court in Vermilla Brown specifically referred to the lease at Guantanamo and said it was the same basic lease. And in fact, Vermilla Brown's a 5-4 decision. Both the majority and the dissent made the analogy to Guantanamo Bay. And then needless to say, every court that's looked at this case in a precedential opinion has reached the same conclusion. The Eleventh Circuit has reached that conclusion. The D.C. Circuit has reached that conclusion. The district court here has reached that conclusion in the District of Columbia. The only authority that even suggests to the contrary is a vacated opinion of the Second Circuit that was vacated by the Supreme Court of the United States. So all the authorities point to the ---- Not for that reason. No, not for that reason. You know, it was just vacated, but it has no precedential weight. No, just for whatever the reasoning might be. And I would suggest, following Judge Randolph's opinion for the D.C. Circuit in the Elota case, that its reasoning isn't worth much because its reasoning is, in fact, inconsistent with Spilar and Vermilla Brown, which is precisely the point that Judge Randolph made for a unanimous panel of the D.C. Circuit in the Elota case. I assume that statement was dictum in the Vermilla Brown. They just used it as an analogy. It's like Guantanamo, they said. Certainly it was dictum. Without really having to decide any issue, they made that observation in 5-4. I think the important thing is that in the Spilar decision, which was a unanimous decision for purposes of identifying what was a foreign country for purposes of the Federal Torts Claims Act, the Court did specifically identify the status of leased military bases abroad and said that they do not affect a transfer of sovereignty. And I would submit that is equally true of a lease, no matter what its terms, that it does not affect a transfer of sovereignty. And that is the important thing. I want to mention one other thing, which is the other point that puts you in the direction of saying that ultimate sovereignty means definitive sovereignty and not any kind of temporal concept, is that that is also in the Spanish translation of the treaty what the language suggests. There it's sovereignty definitiva, which under any definition I think of that word is, you know, not subject to changes would be the translation of the Spanish definition of that term. So I think, and there's Supreme Court precedent for the notion that when there's a possibility to interpret a provisions of an English version of a treaty and a Spanish version of a treaty to coincide, that that's the favored translation or the favored interpretation of the treaty. There are other arguments that are raised to try to distinguish the Eisentrager decision, but I think the important thing is that those distinctions are not supported by the decision itself or by subsequent interpretations of that case by the United States Supreme Court and this court. I mean, for example, it's been suggested that somehow it doesn't apply, the Eisentrager principles don't apply to aliens who are not somehow already designated to be enemy aliens. But the Supreme Court, for example, in the Verduga-Urquidez case, has said that the principles of Eisentrager apply to aliens, not to enemy aliens. That case came up in the context of an individual from Mexico who clearly wasn't an enemy alien. This court in a number of cases has dealt with the entry fiction in the immigration context and has applied it to all aliens who aren't present in the United States, not just to enemy aliens. I see my time is about to expire. If there are no other questions, I'd stop. If you have anything that you really think is important, don't feel that you have to be held to the exact limit. Well, I think, Your Honor, I think the important points are the ones that I've made. In a sense, this case, Eisentrager, I think, looms very large in this case, and I don't think it is distinguishable for purposes of this case. I would point out, as we do in the brief, that if this court were to disagree with the other courts that have looked at this question and found that there is jurisdiction in the United States court, it would be far from obvious, and we would suggest it would not be true, that the proper court would be the Central District of California and that the proper jurisdiction for such a suit. The Central Virginia is what you're saying. Yeah, I think Eastern District of Virginia would be the most proper place for it. I think there is an argument, and Judge Motz reached the conclusion, that the district court for the District of Columbia is the right solution. I think if you look at the cases that sent cases to the DDC, they were either from a time period where that's where actually the Defense Department was located, or they just sort of did it without sort of analyzing exactly why the DDC rather than the EDVA would be the right place. I think the most thorough analysis of that point is in the D.C. Circuit's Monk decision, and that specifically finds that the EDVA is the proper place. If there are no further questions, let's rest on the briefs. Thank you, Your Honor. Thank you, Chairman. Anywhere but Virginia or the Fourth Circuit. I don't think that issue was before this court. I think the government engaged in some forum shopping by sticking those other cases where they stuck them and by taking people into that circuit. The only additional point I'd like to make is to take up Judge Shader's point about the temporality of the concept of ultimate and take that point to its logical conclusion, which is that it entails the notion, which I think is a fact here, that presently the United States of America in fact has jurisdiction over Guantanamo Bay, such that American courts can exercise their jurisdiction there, both in fact and in law, taking that point. I have nothing else that I can add to this unless there are any questions. What about counsel's point about the corresponding Spanish word and the fact that that sounds like definitive rather than temporal? I don't know. Here's my guess. I taught Spanish in high school in New York City in 1968 and 69, and my Spanish no longer is what it was then. I would have to research that and look at the etymology of the word, and I'll do that and submit a Rule 28J statement to this court because I think the point needs to be addressed.  My guess is that with respect to American courts' interpretations of American treaties, that we use the English and not the Spanish or the Korean or the Japanese. But I may be wrong on that, and I certainly, when I get back to the question. Do you disagree with the overall point that if there is ambiguity in the English but the companion translation is unambiguous, that we should look to the companion language? I neither agree nor disagree because I haven't researched it and I don't know the answer. However, I do not agree that there is any ambiguity whatsoever in the use of the phrase ultimate. It has to mean something under the rules of statutory interpretation or construction as I understand them, and I recently researched that in one of the recall cases that we're handling. The words have to mean something. I think the word ultimate is unambiguous in English as we understand it. It means somewhere later. It's not a spatial term. It's certainly a temporal term, so I don't agree with the premise, but I don't know the answer to the question, and I will, when I get back to Los Angeles this evening, start to research. English doesn't ultimate also mean just the biggest and the best. We have the ultimate in spa treatments here. It doesn't mean you can't come this week. It means we're the best. Well, it doesn't mean that in ultimate sovereignty we have the best sovereignty, so that doesn't fit. Well, it could mean that it is the most important rather than future. I don't think it's a quantitative term. I'm trying to interpret it according to what I would understand ordinary language usage to be, and it seems to me to be temporal. I'm sure someone could, if they chose to, interpret it the way that you, Judge Graber, are interpreting it. It just doesn't seem to me that in the context of a treaty that it's quantitative. It seems to me, as Judge Schader pointed out, that it's temporal. I asked a question, of course, but thanks for the suggestion that I pointed it out. Thank you. Thank you, counsel. Case just argued will be submitted. Thank you both very much.
judges: Reinhardt, Graber, Shadur